UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GERALD F. RICHARDS,          )          CIVIL ACTION NO. 04-CV-40054-FDS
    Plaintiff          )
               )
v.          )
               )
SOUTHBRIDGE POWER &          )
THERMAL, LLC,          )
    Defendant          )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This case involves injuries the plaintiff, Gerald Richards, sustained on January 23, 2001, while working at a job site at the Southbridge Power Plant in Southbridge, Massachusetts. The plaintiff alleges that the defendant, Southbridge Power & Thermal, LLC ("Southbridge"), as the owner of the construction project, retained sufficient control over the work being performed and was therefore required to exercise reasonable care for the safety of workers at the job site, including the plaintiff. The plaintiff further contends that the defendant was negligent in its supervision and oversight of the work and is therefore liable for his injuries. *See, e.g., Corsetti v. Stone*, 396 Mass. 1, 483 N.E.2d 793 (1985). Because there exists a dispute as to material facts in this case, the defendant's Motion for Summary Judgment should be denied.

### II.    FACTS OF THE CASE

At the time of this incident, the plaintiff was working as a welder for Abington Constructors, a pipe installer, at a construction project at the Southbridge Power Plant in Southbridge, Massachusetts. The construction project involved an upgrade of the existing power plant and the installation of new pipes throughout the facility. The defendant, Southbridge, was the owner for purposes of the contract governing the upgrade project. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 60). Southbridge contracted with Waldron-Abington, LLC ("Waldron-Abington") for the construction of the upgrade project. (*See* Exhibit C to Defendant's Motion). In addition, Southbridge entered into a contract with Aradia

Management, LLC ("Aradia") to serve as its project manager for this construction project. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 13). In particular, Southbridge hired a project manger named Jim Templeton to act on behalf of Southbridge to make sure "the project was executed properly, on schedule, on budget, and in accordance with the agreement." (*See* Exhibit 1, Deposition of Thomas Shepard, pp. 13-14). Southbridge has acknowledged that Mr. Templeton was its agent for purposes of this upgrade project. (*See* Exhibit 1, Deposition of Thomas Shepard, pp. 61-62). Mr. Templeton made regular reports of the progress of the work which were relayed to Thomas Shepard, one of the principals of Southbridge. (*See* Exhibit 1, Deposition of Thomas Shepard, pp. 10-12). Mr. Shepard was "responsible for the operations of the plant and [thru Aradia] for the project." (*See* Exhibit 1, Deposition of Thomas Shepard, p. 13). Mr. Shepard not only received the reports from Mr. Templeton, he also regularly attended the monthly meetings and walked the site to review the progress of the work. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 39). Among the subjects of discussion at those monthly meetings was job safety. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 55). Mr. Richards testified that Southbridge was frequently on the job site inspecting hanging pipes. (*See* Exhibit 2, Deposition of Gerald Richards, pp. 74-75).

Southbridge retained the right to monitor the work at the job site including, if Southbridge determined that the work was not being done in accordance with the contract, to specify changes. (*See* Exhibit 1, Deposition of Thomas Shepard, pp. 57-59). Mr. Shepard testified that, as the owner of this project, Southbridge wanted to insure that the work was done safely. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 61). He further testified that if Southbridge saw something at the site that was not safe, Southbridge would have addressed that issue. (*See* Exhibit 1, Deposition of Thomas Shepard, p. 61). In particular, if Mr. Templeton observed something or was aware of something at the project that he felt was not being done in accordance with safe construction site practices, he would have had the authority, on behalf of

2

Southbridge, to direct Waldron-Abington to remedy that safety issue. (*See* Exhibit 1, Deposition of Thomas Shepard, pp. 62-63).

The plaintiff's job involved welding pipes that were hung from the ceiling to T-braces positioned underneath the pipes. (*See* Exhibit 2, Deposition of Gerald Richards, pp. 69-70, 78). On the day of the accident, the plaintiff was positioned on scaffolding near a pipe that extended from one room into another room through a hole that had been created in a concrete wall. (*See* Exhibit 2, Deposition of Gerald Richards, pp. 72-73). The plaintiff was preparing to weld the 2000-lb. pipe onto a bracket when the pipe rolled off the bracket, pinning the plaintiff's arm and causing him to sustain a crush injury. (*See* Exhibit 2, Deposition of Gerald Richards, pp. 102-104, 107-108, 137-138). The pipe the plaintiff was working on had been hoisted into place before he began working on it. (*See* Exhibit 2, Deposition of Gerald Richards, p. 82). The pipe was hanging in the air from a chain-fall. (*See* Exhibit 2, Deposition of Gerald Richards, p. 77). The number of pipes that were hanging on chain-falls before they were welded created a risk of injury because of the number of people working in the area and the chance that one of those pipes could be jostled or moved by someone working on the other side of the wall. (*See* Exhibit 2, Deposition of Gerald Richards, pp. 104, 154-156).

## III.   THE SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate in cases where there are no genuine issues of material fact. *See* Fed. R. Civ. P. 56C. The party moving for summary judgment has the burden to show the absence of any evidence that would establish an element of the non-moving party's case. *See Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 575 N.E.2d 734 (1991) citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986). The standard to be applied is not whether the evidence favors one side or the other but whether, on the facts presented, a jury of reasonable people could potentially return a verdict for the plaintiff. *See Flesner v. Technical Communications Corp.*, 410 Mass. 805, 575 N.E.2d 1107 (1991) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986).

## IV.    ARGUMENT

The defendant is not entitled to summary judgment in this case because Southbridge maintained sufficient control over the work being performed by Waldon-Abington at the job site. *See Cheschi v. Boston Edison Company*, 39 Mass.App.Ct. 133, 654 N.E.2d 48 (1995) (owner's involvement in project may subject it to retained control theory, thereby invoking duty of reasonable care). This is established by the Restatement of Torts, which states that "one who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement of Torts (Second), §414.

Whether or not an owner retains sufficient control over an independent contractor is generally a question for the jury. *Ryan v. Rust Engineering*, 1995 Mass. Super. LEXIS 687 (1995). Here, as is established by the defendant's own testimony, Southbridge retained the right to control the work of the general contractor and to intervene if it determined that safety issues were not appropriately addressed. The fact that Southbridge contracted with another party (Aradia) to act as its agent for purposes of overseeing compliance with the work and with the terms of the contract does not obviate but, in fact, reinforces the duty owed by Southbridge to workers at the job site. Indeed, Southbridge's contract with Aradia specifically sets forth the degree of involvement Southbridge, albeit through its agent, was to retain for the project. (*See* Exhibit E to Defendant's Motion). Whether the owner has control, however minimal, and/or maintains some modest level of control over a subcontractor, is an issue for the jury. *Dilvaeris v. W.T. Rich Co, Inc.*, 424 Mass. 9, 673 N.E.2d 562 (1996).

Here, the plaintiff has established a material issue of fact as to the nature and extent of Southbridge's involvement in the construction upgrade project, including the extent to which Southbridge may be responsible for the failure to provide adequate safety measures with respect to the installation of pipes at the job site.

4

## V.  CONCLUSION

Based upon the facts and evidence set forth herein, the plaintiff has established a triable issue of fact as to the defendant's involvement in this construction project, and duty owed to the plaintiff, that should preclude summary judgment.  Accordingly, the defendant's motion must be DENIED.

Respectfully submitted,
By his Attorneys,

KECHES & MALLEN, P.C.

CHARLOTTE E. GLINKA
BBO # 559117
122 Dean Street
Taunton, MA 02780
(508) 822-2000

DATED: October 14, 2005
Opp-SJ

5

# EXHIBIT 1

Case 4:04-cv-40054-FDS    Document 27    Filed 10/17/2005    Page 7 of 26

Case 4:04-cv-40054-FDS    Document 26-3    Filed 10/17/2005    Page 2 of 9
DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 1    PAGE 1

PAGE 1

COMMONWEALTH OF MASSACHUSETTS
Trial Court of the Commonwealth

WORCESTER, ss          Superior Court Department
C.A. No. 04-00082C         Rule 30 Deposition

GERALD F. RICHARDS

-vs-

SOUTHBRIDGE POWER & THERMAL, LLC.

DEPOSITION of THOMAS H. SHEPARD taken pursuant to
Rule 30 of the Massachusetts Rules of Civil Procedure
on behalf of the Plaintiff before Barbara St. Jean,
CSR, RPR, a Notary Public in and for the Commonwealth of
Massachusetts at the law offices of Keches & Mallen,
141 Tremont Street, Boston, Massachusetts, commencing
on Tuesday, April 26, 2005, at 10:00 o'clock a.m.,
pursuant to Notice and agreement of parties as to the
date and time of taking said deposition.

APPEARANCES: Charlotte E. Glinka, Esquire
         LAW OFFICES OF KECHES & MALLEN, P.C.
         141 Tremont Dean Street
         Boston, Massachusetts 02109;
         Representing the Plaintiff.

         Keith L. Sachs, Esquire
         OFFICES BOYLE, MORRISSEY & CAMPO, P.C.
         695 Atlantic Avenue
         Boston, Massachusetts 02111;
         Representing the Defendant.

         Parisi Court Reporting
         270 Hixville Road
         North Dartmouth, Massachusetts  02747
         (508) 984-5502
         Barbara St. Jean, RPR, CSR No. 127693

---

PAGE 3

1                 E X H I B I T S
2                    (Continued)
3    Plaintiff's
     Numbers
4                                    Page
5    14   Certificate of Acceptance         71
6    15   Safety Meeting, January 30, 2001   72
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

         Parisi Court Reporting  (508) 984-5502

---

PAGE 2

1              I N D E X
2                           Page
3    THOMAS H. SHEPARD
4    Direct Examination By Ms. Glinka        4
5
6
7
8              E X H I B I T S
9                (Not Included)
10   Plaintiff's
     Numbers
11                              Page
12   1    Notice of Taking Deposition        5
13   2    Answers to Interrogatories         6
14   3    File Folder of Lease Agreements    11
15   4    Report of Occupational Accident    18
16   5    January, 2001, Monthly Report      19
17   6    EPC Contract, June, 200            38
18   7    Minutes of Meeting dated 1/10/01   53
19   8    Amendment Agreement                63
20   9    Project Manager Agreement          64
21   10   Abington Accident Prevent Plan     64
22   11   Weekly Safety Checklists           67
23   12   Performance Bonds & Insurance Policies  69
24   13   Letter from Waldron-Abington       70
         Parisi Court Reporting  (508) 984-5502

---

PAGE 4

1                    (April 26, 2005
2                    Tuesday, 10:04 a.m.)
3         MS. GLINKA: Good morning,
4    Mr. Shepard. My name's Charlotte Glinka. I
5    represent the Plaintiff Gerald Richards in this
6    case.
7         THOMAS H. SHEPARD, a witness called
8    on behalf of the Plaintiff, having been duly sworn
9    on oath, deposes and says as follows:
10        DIRECT EXAMINATION
11   Q  (By Ms. Glinka) Would you please state your full
12      name.
13   A  Thomas Harold Shepard.
14   Q  And, Mr. Shepard, you are here today in your
15      capacity as the designee or the individual who's
16      been identified as the person with the most
17      knowledge regarding the circumstances surrounding
18      this incident involving Mr. Richards.
19   A  That's correct.
20   Q  Okay. And do you recall seeing a Deposition Notice
21      for this deposition? I'll show you a copy.
22   A  Yes. Just recently.
23   Q  Okay. And are you the person who's been designated
24      to testify about the subject matters that are
         Parisi Court Reporting  (508) 984-5502

Case 4:04-cv-40054-FDS    Document 26-3    Filed 10/17/2005    Page 3 of 9
DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 4 PAGE 9

9

1 Q  Okay.  What was the work that was being done at that
2      time?
3 A  It was a repowering of the facility.  We had an EPC
4      contractor, Waldron-Abington, that did all the work;
5      but we were just adding the equipment I just
6      described.
7 Q  All right.  So Southbridge Power and Thermal owns as
8      you've described the equipment that was put in as
9      part of that renovation project, if you will.
10 A  Yes.
11 Q  Okay.  And other than that, do they own any other
12      parts of the facility?
13 A  No.
14 Q  And who now operates that facility?  Is it still
15      being operated by Southbridge Power and Thermal?
16 A  Yes.
17 Q  What was -- and I have the Lease Agreement, but
18      basically what was the agreement between Southbridge
19      Associates Limited Partnership and Southbridge Power
20      and Thermal?
21 A  The agreement was -- well, then just to clarify,
22      that original lease agreement was not signed by --
23      well, it was signed prior to my company owning the
24      facility.  The facility was originally -- the
              Parisi Court Reporting (508) 984-5502

PAGE 10

10

1      original lease -- or Southbridge Power and Thermal
2      was owned by a company called Yesco.  We purchased
3      it after this first lease was signed -- was -- was
4      executed.
5          But that lease basically covered two
6      pieces.  One was the operation of the facility
7      before the upgrade; and then the other was the
8      operation of the facility after the upgrade.  So
9      prior to the upgrade, Southbridge Power and Thermal
10      operated the facility, but on a past-due basis,
11      just at cost.  And they were paid a fee on top of
12      that.
13 Q  After the upgrade?
14 A  Where we were requiring to put in certain equipment
15      which I already described, then we operated it more
16      like a utility in that we provided the products at a
17      unit cost rather than the straight past-due
18      operating cost.
19 Q  And so that prior to -- when was the -- when did
20      Thermagen take over Southbridge Power and Thermal?
21 A  Well, in I believe it was -- it was the summer.  I
22      don't remember the exact month, but June or July of
23      2000, Acetex Energy purchased Southbridge from
24      Yesco, Acetex Energy Holdings.  Acetex Energy
              Parisi Court Reporting (508) 984-5502

PAGE 11

11

1      Holdings changed their name in I believe January of
2      2001 to Nations Energy Holdings.  And Nations Energy
3      Holdings owned Southbridge Power and Thermal until
4      the end of December of 2004.  Thermagen purchased in
5      December 27th, 2004.
6 Q  Okay.  But at the time of the events that took place
7      in this case, the Southbridge Power and Thermal
8      was owned by Nations Energy?
9 A  Correct.
10 Q  Okay.  And that was approximately you say the
11      summer of 2000?
12 A  It was the summer of 2000 when they purchased it.
13          MS. GLINKA:  Well, I'm just going to
14      have these --
15          Are these my copies, Mr. Sachs?
16          MR. SACHS:  Yes.
17          MS. GLINKA:  I'm just going to have
18      this whole folder marked as the Exhibit, the lease
19      agreements.
20          (Whereupon the above-described
                folder was then marked as
21          Plaintiff's Exhibit No. 3)
22 Q  Now, did you hold a position with Nations Energy
23      before Thermagen?
24 A  Yes.
              Parisi Court Reporting (508) 984-5502

PAGE 12

12

1 Q  And what was your position with Nations Energy?
2 A  At the time when we purchased the facility, I was
3      Vice-President of Operations.
4 Q  And how long did you have that position?
5 A  I had that position for about a year.  And then I
6      was Senior Vice-President.  And then in October of
7      2003, I became President of Nations Energy.
8 Q  Okay.  And you held that position until the company
9      changed over?
10 A  Yes.
11 Q  And that was in --
12 A  We had a management buy-out in December.
13 Q  That was December of 2004, just last year?
14 A  That's correct.
15 Q  Okay.  So that as of -- again, going back to the
16      time period of this case, in January, 2001, you were
17      V. P. of Operations for Nations Energy?
18 A  Yes.
19 Q  Did you have any direct involvement in preparing
20      any of the contracts for the upgrade that was done
21      at the power plant?
22 A  Yes.  I did.  They -- I started with Nations Energy
23      in March of 2000.  The negotiations were already
24      underway when I joined; but -- and the primary
              Parisi Court Reporting (508) 984-5502

DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 4 PAGE 13

PAGE 15

**13**

1 negotiation of the agreement, the EPC agreement with
2 Waldron-Abington, was being handled by two other
3 people; but I did get involved from an operating
4 standpoint with the negotiation in the agreement.
5 Q Okay. Did you have any on-site responsibilities at
6 Southbridge Power and Thermal during the process of
7 that upgrade?
8 A Yes. I was responsible for the operations of the
9 plant and then indirectly responsible for the
10 project.
11 Q When you say indirectly, what do you mean?
12 A We had a Contract Project Manager.
13 Q Who was that?
14 A It was actually contracted to Aradia.
15 Q A-R-A-D-I-A?
16 A I think that's how it's spelled. A gentleman named
17 Jim Templeton was the Project Manager.
18 Q And they -- I'm sorry.
19 A And then he reported to Cathy Ramsey. He was an
20 engineer who was actually a contractor, another
21 contractor employee of Nations Energy. Those two
22 had the primary responsibility for the facility; but
23 Cathy reported to me.
24 Q I'm sorry. Her last name was?

Parisi Court Reporting  (508) 984-5502

**15**

1 A I have a B.S. in Mechanical Engineering from the
2 University of Oklahoma.
3 Q And when did you obtain that degree?
4 A Nineteen seventy-six.
5 Q Do you have any further education beyond college?
6 A No.
7 Q Do you have any professional licenses?
8 A No.
9 Q What did you do for work after you completed your
10 studies?
11 A I went to work for Ingersoll Rand Compression
12 Services as a field representative, worked in the
13 field operating air and gas compressors for natural
14 gas compression and oil drilling, worked my way up
15 until I was Regional Manager.
16 Q What region was that?
17 A Rocky Mountain region. I had Colorado West. Left
18 there in 1980, went to work for a company called
19 Production Operators. Started off in sales. Then I
20 was a pipeline engineer; became V. P. of Enhanced
21 Oil Recovery and then became V. P. of Operations and
22 Executive V. P. of the company. Was there for 14
23 years.
24 Q So that takes us to about 1994?

Parisi Court Reporting  (508) 984-5502

PAGE 14

**14**

1 A Ramsey.
2 Q And was Mr. Templeton employed by Aradia? Or was
3 he employed by Nations Energy?
4 A Aradia. He owns -- he is Aradia. He's the sole
5 board.
6 Q And when you say Project Manager, what was his
7 function or role with respect to the project?
8 A He was responsible for making sure the project was
9 executed properly, on schedule, on budget, and in
10 accordance with the agreement. His -- he was on
11 site once a week and then attended monthly meetings.
12 Q And did you meet periodically with Mr. Templeton to
13 review the progress of the work?
14 A His report of any information was passed on to Cathy
15 and then usually passed on to me. But I was at the
16 site about once a month, and usually when Jim was
17 there.
18 Q So you'd have occasion to meet with him on those --
19 A Yes.
20 Q -- occasions? But essentially, the reporting went
21 from Mr. Templeton through Ms. Ramsey to you.
22 A Correct.
23 Q Okay. If you could tell me briefly your educational
24 background beginning with college.

Parisi Court Reporting  (508) 984-5502

PAGE 16

**16**

1 A Right.
2 Q And then what did you do after that?
3 A Went to work for Air Liquide. It's a French
4 company. Liquid with an E on the end. Was Director
5 of On-Site Plans. Operated all of their domestic
6 what they call tonnage plants, but air-separation
7 plants. Was also --
8 Q Was that in the U. S.?
9 A In the U. S. U. S. and Trinidad. Worked for them
10 for three years. Went to work for a company called
11 MG Industries in Philadelphia. I was V. P. of Latin
12 America. I had business responsibilities for
13 Mexico, Central America, and the Caribbean, and
14 operations and engineering responsibilities for all
15 of Latin America.
16 Q And how long were you with them?
17 A Until March of 2000.
18 Q And that's when you went to Nations Energy?
19 A Correct.
20 Q So you are familiar then with the contracts that
21 pertain to this project, I take it.
22 A Yes.
23 Q And have you had occasion to review those recently
24 or --

Parisi Court Reporting  (508) 984-5502

BARBARA ST JEAN, RPR, CSR No. 127693

DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 10    PAGE 37

**37**

1  a representative that usually came to the monthly
2  meetings who was technically responsible for SALLC.
3  His name was John Sourian.
4  Q  Spell that, please.
5  A  I think it was S-O-U-R -- S-O-U-R-I-A-N. Like sour.
6  Sour -- Sour I-A-N. And so he came to the meetings
7  to -- to coordinate between -- you know, the
8  interface between what we were -- we were providing
9  to the hotel and conference center and with their
10  construction activities. He was construction
11  manager for SALLC for the hotel and conference
12  center. And then occasionally Ron Nikeno would
13  come. He represented SALP and the tenants.
14  Q  But in terms of any contractual responsibilities for
15  the upgrade project, those entities did not have any
16  contractual --
17  A  No.
18  Q  -- responsibility?
19  A  No.
20  Q  Okay. I'll show you what I believe is the contract
21  between Southbridge, and it says EPC contractor.
22  That's the June, 2000, contract?
23  A  Uh-huh.
24  Q  Yes?

Parisi Court Reporting (508) 984-5502

PAGE 38

**38**

1  A  Yes.
2  Q  And is this the contract that existed for the
3  upgrade project?
4  A  That's correct.
5  MS. GLINKA: Okay. Let me just mark
6  that as the next exhibit.
7  (Whereupon the above-described
document was then marked as
8  Plaintiff's Exhibit No. 6)
9  Q  And the EPC contractor as we've discussed earlier
10  was Waldron-Abington, LLC?
11  A  Yes.
12  Q  That's who's referred to as the EPC contractor?
13  A  Correct.
14  Q  All right. You mentioned earlier John Sweet was the
15  Project Manager for Waldron Engineering. Did you
16  have any direct dealings with Mr. Sweet during the
17  course of this upgrade?
18  A  Yes.
19  Q  And what were the -- what was the interface between
20  you and Mr. Sweet?
21  A  I would -- I would attend, not every month but
22  reasonably often, the monthly meetings. And John
23  was at those meetings. And then about in, say, late
24  spring of 2001, prior to the start-up, we stopped

Parisi Court Reporting (508) 984-5502

PAGE 39

**39**

1  using Cathy; and because we were just finishing up
2  the project. And I worked directly with Jim and
3  Waldron from that point on.
4  Q  These monthly meetings, were those -- did those
5  take place at the plant?
6  A  Yes.
7  Q  And when you would attend those monthly meetings,
8  would you do a walk-through of the facility to see
9  what the progress of the work was?
10  A  Yes.
11  Q  Do you know whether any photographs were taken of
12  the progress of the work?
13  A  I believe that Jim Templeton took some during that
14  time.
15  Q  Do you know whether there are any plans or
16  blueprints or drawings or diagrams that show what
17  work was to be done?
18  A  Yes. There were.
19  Q  And who would have possession of those?
20  A  We would have a copy at the plant.
21  Q  Would those plans -- what are those? Blueprints?
22  Drawings?
23  A  They're drawings.
24  Q  Okay. Would those drawings show where the pipe work

Parisi Court Reporting (508) 984-5502

PAGE 40

**40**

1  was to be done?
2  A  They would show -- what we have are as-built
3  drawings that show the piping in place.
4  Q  They showed it in place?
5  A  Yes.
6  Q  And were those meant as guides for the work or --
7  A  No. What -- we did not get construction drawings.
8  What we got were as-builts, which are here's --
9  here's what the facility looks like now. That it's,
10  complete.
11  Q  And who prepared those as-built drawings?
12  A  Waldron-Abington.
13  Q  And would those drawings still be in Nations
14  Energy's possession?
15  A  At the site, yes.
16  Q  At the site?
17  A  Yes.
18  Q  At Southbridge?
19  A  Correct.
20  Q  Okay. Do you have copies of those in Chicago?
21  A  Excuse me. No.
22  Q  But you could make those available?
23  A  Yes.
24  Q  All right. I'll make a request to counsel.

Parisi Court Reporting (508) 984-5502

DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 14 PAGE 53

53

1 It simply has the Action Item lists me as one of the
2 items on the action list. Doesn't necessarily mean
3 I was at the meeting; so I don't remember.
4     MS. GLINKA: All right. We'll just
5 mark that as an exhibit.
6     (Whereupon the above-described
        document was then marked as
7     Plaintiff's Exhibit No. 7)
8 Q And just to beat a dead horse here, you don't
9 recall the incident involving Mr. Richards being
10 discussed at the February meeting?
11 A No. I do not.
12 Q Are you familiar with the term come-alongs?
13 A Yes.
14 Q And what are come-alongs?
15 A They are cable -- they usually refer to a cable
16 hoist; but can also be a chain hoist that's just
17 hand operated.
18 Q And do you know whether the pipes being put in as
19 part of this upgrade were installed by using the
20 come-alongs?
21 A I don't know.
22 Q I'm sorry?
23 A I do not know.
24 Q Okay. You didn't see any of that part of the work

Parisi Court Reporting (508) 984-5502

PAGE 54

54

1 being done?
2 A No.
3 Q And is that term come-along, is that the same as a
4 chain fall?
5 A I don't think they are. I mean, some people could
6 refer to a chain fall as a come-along. But to me,
7 they're a little different.
8 Q What's your understanding of what a chain fall is?
9 A A chain fall is a chain hoist, usually hanging. A
10 come-along -- a chain fall is actuated by pulling on
11 a chain, and it cranks the hoist. A come-along is a
12 hand-cranked hoist. But to me -- different people
13 may refer to them differently.
14 Q Do you know whether chain falls were used to assist
15 in installing the pipes at the plant?
16 A I do not.
17 Q And are you familiar with the term pipe hangers?
18 A Yes.
19 Q What are pipe hangers?
20 A Just a way to support piping from the -- from the
21 ceiling. At least -- I believe just to support --
22 as opposed to -- either from -- they hang them from
23 a rack or from a wall or from a ceiling, rather than
24 have them resting on a rack.

Parisi Court Reporting (508) 984-5502

PAGE 55

55

1 Q So would a pipe rack be considered a pipe hanger?
2 A I don't think so.
3 Q Okay. Do you know whether pipe hangers were used as
4 part of the installation of the piping at the
5 Southbridge plant?
6 A I don't know.
7 Q As part of the monthly meetings, was the subject of
8 job safety discussed as one of those topics?
9 A Yes.
10 Q Do you recall in any of the meetings that you
11 attended the subject came up regarding the safety of
12 installation of these pipes?
13 A No.
14 Q Under that contract that Southbridge had with
15 Waldron or the EPC contractor, is it fair to say
16 that Southbridge retained the right to review all
17 the specifications for construction of the project?
18     MR. SACHS: Objection. If you want
19 to show him the contract, that's fine.
20 Q Do you know?
21 A We reserved the right to review drawings, but not
22 construction techniques. So we would not have had
23 the right to -- to review how they actually put the
24 piping in, only the drawings and the routing of the

Parisi Court Reporting (508) 984-5502

PAGE 56

56

1 piping to begin with.
2 Q But -- well, strike it. Southbridge retained the
3 right to monitor all the work that was done at the
4 project. Correct?
5     MR. SACHS: Objection. I mean, at
6 this point, you're gonna have to show him the
7 document. I mean, if you want him to testify from
8 his memory, that's one thing. But the document's
9 gonna be the document, so --
10     MS. GLINKA: Right. And I'm just
11 asking based on his recollection of the contract.
12     MR. SACHS: That's fine. He can
13 testify to his recollection. But ultimately,
14 whatever the contract says is what it says.
15     MS. GLINKA: Right.
16     MR. SACHS: So to the extent you
17 have any memory, that's fine.
18 A We were -- we were always allowed access to the
19 site.
20 Q You were allowed access, but also the right to
21 monitor the work that was being done; correct?
22 A We had the right to monitor. I don't know that we
23 certainly had the right to change it.
24 Q Well, if you --

Parisi Court Reporting (508) 984-5502

DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 15  PAGE 67

**67**

1 A  In other words, if we walked in there and said we
2    don't like the way you're doing that, and they --
3    they could come back and say, well, we're gonna do
4    it this way until you wanna pay for it to do it
5    differently.  That could happen.
6 Q  But I guess as a general statement, Southbridge had
7    the right to monitor the work that was being done.
8 A  Yeah.  I mean, I'm not tryna be cute.  It's just
9    that -- it's -- it's -- we could always watch what
10   they were doing.  We could not necessarily, if I
11   remember correctly, have the right to tell them to
12   do it differently.
13 Q  Well, could you though if Southbridge felt that
14   whatever was being done was not being done in
15   accordance with the specifications that Southbridge
16   had established, that the work could be --
17 A  Oh, absolutely.
18 Q  -- changed?
19 A  If it wasn't being done in accordance with the
20   specs, absolutely.
21 Q  Okay.  And the contract with Waldron gave
22   Southbridge the right to assess the progress of the
23   work at the job site; correct?
24 A  Correct.

Parisi Court Reporting  (508) 984-6502

PAGE 68

**68**

1 Q  Okay.
2 A  And I don't know if it was specifically that in the
3    contract, but yes.
4 Q  Okay.  The contract allowed Southbridge the right to
5    inspect the work and any equipment, materials,
6    construction service, or workmanship at the job
7    site.
8        MR. SACHS:  I'm just gonna continue
9    the objection on that.
10 A  Yeah.  I mean, I would suspect so; but I don't
11   remember for sure the details of the contract.
12 Q  Okay.  Let me just -- okay.  Referring to the
13   document we've marked Exhibit 6, which is the
14   contract, and in particular Page 13 where it says
15   owners right to review design at the top, and then
16   owners right to monitor work --
17 A  Uh-huh.
18 Q  -- do you see those sections?
19 A  Yes, I do.
20 Q  Okay.  And those sections established -- set forth
21   Southbridge's right to review the specifications for
22   the construction of the project.  Correct?
23 A  Correct.
24 Q  All right.  And the right to monitor work done at

Parisi Court Reporting  (508) 984-6502

PAGE 69

**69**

1    the project; correct?
2 A  Yes.
3 Q  Including monitoring quality control at the job
4    site --
5 A  That's right.
6 Q  -- and monitoring the project schedule and progress
7    of work --
8 A  Correct.
9 Q  -- and inspecting the work, equipment, materials,
10   construction service, and workmanship at the job
11   site.
12 A  Correct.
13 Q  And it included maintaining a site presence to
14   coordinate the work being performed at the job
15   site.  Correct?
16 A  We had the right to maintain a site presence.  Yes.
17 Q  And you did that?
18        MR. SACHS:  Objection.
19 Q  Did you have a site presence?
20 A  Not 24 hours a day, but yes.
21 Q  I understand.  But you were involved on a regular
22   basis --
23 A  Yes.
24 Q  -- with overseeing the work that was being done.

Parisi Court Reporting  (508) 984-6502

PAGE 60

**60**

1 A  Yes.
2 Q  And as the -- well, I want to be clear about the
3    terms we're using.  Would you consider or do you
4    consider Southbridge to be the owner for purposes of
5    this contract?
6 A  The owner of the -- of the activities that were
7    being produced, they were being performed under
8    this, yes.
9 Q  Okay.  So when this document refers to owner, it's
10   referring to Southbridge as the owner of this
11   upgrade project.
12 A  Correct.
13 Q  Okay.  And as the owner of this upgrade project,
14   Southbridge had an obligation to be sure that work
15   at the plant was being done in accordance with
16   safety construction site practices.  Correct?
17        MR. SACHS:  Objection to the form.
18   It's a legal question.  So if you have an
19   understanding, go ahead.
20 A  I -- I don't know.  I mean -- I don't know what our
21   obligation was.  Waldron and Abington were
22   responsible for the safety.  They were responsible
23   for providing a safety program and in doing the work
24   safely.  So --

Parisi Court Reporting  (508) 984-6502

Case 4:04-cv-40054-FDS    Document 26-3    Filed 10/17/2005    Page 8 of 9
DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)
SHEET 16 PAGE 61

61

1  Q  Right. And Southbridge as the owner of the upgrade
2     project wanted to insure that the work was done
3     safely.
4  A  Absolutely.
5  Q  Okay.
6  A  And if we saw something that was not safe, we would
7     have included that.
8  Q  Okay. And in terms of overall responsibility as the
9     owner of this project, Southbridge had an obligation
10    to be sure that the work was done safely.
11         MR. SACHS: Again, objection. Legal
12    question.
13         MS. GLINKA: You can answer.
14 A  I mean, part of -- part of Jim Templeton's
15    responsibility was to make sure that work was done
16    in accordance with the agreement. And also if he
17    saw something that was unsafe, he would have pointed
18    it out. But we weren't there 24 hours a day
19    monitoring to make sure they did work safely.
20 Q  And can we agree that Mr. Templeton in his role as
21    Project Manager for Aradia was an agent of
22    Southbridge for purposes of this upgrade project?
23         MR. SACHS: Again, objection. From
24    the legal standpoint, I mean, whatever your
            Parisi Court Reporting  (508) 984-5502

62

1     understanding is, fine.
2         THE WITNESS: Yes.
3  Q  Okay. In other words, he was the conduit, if you
4     will to use an engineering term, between what was
5     going on at the site and what was -- and reporting
6     it back to Southbridge.
7  A  Correct.
8  Q  Okay. And if Mr. Templeton observed something or
9     was aware of something at the project that he felt
10    was not being done in accordance with safety
11    construction site practices, he would have reported
12    that back to Southbridge; correct?
13 A  Not necessarily. He may have. He most likely would
14    have just grabbed the -- whoever the appropriate
15    person on the site was, whether it was John Sweet or
16    Jeremy Smith or one of those, and say, hey, you
17    know, I don't think this is being done correctly or
18    safely. You outta do it differently. That may have
19    happened. But, again, he was only on site one day a
20    week.
21 Q  Was there anyone who -- with any reporting
22    responsibility at Southbridge who was there more
23    than one day a week?
24 A  Not related to the project.
            Parisi Court Reporting  (508) 984-5502

63

1  Q  Okay. But Mr. Templeton then if he saw something
2     should be done differently could direct his comments
3     directly to Waldron or to anyone else there at the
4     job who he felt needed to take care of that.
5  A  Yes. That doesn't necessarily mean they would have
6     to do it differently; but he would point it out,
7     yes.
8  Q  Okay. And did Mr. Templeton attend the regular
9     safety meetings at the job?
10 A  I don't know.
11         MR. SACHS: Can I get a coffee
12    refill?
13         MS. GLINKA: Sure.
14         (Off the Record)
15         MS. GLINKA: Okay. Back on. Let me
16    just go through some more of these documents here.
17 Q  This one is an Amendment Agreement apparently dated
18    November, 2000. That was an amendment to the
19    original contract.
20 A  Yes.
21         MS. GLINKA: Let me just mark that
22    as an exhibit.
23         (Whereupon the above-described
                   document was then marked as
24         Plaintiff's Exhibit No. 8)
            Parisi Court Reporting  (508) 984-5502

64

1  Q  And this appears to be the agreement retaining to
2     Mr. Templeton as the Project Manager for the job.
3  A  Correct.
4         (Whereupon the above-described
                   document was then marked as
5         Plaintiff's Exhibit No. 9)
6  Q  This appears to be the Accident Prevention Plan of
7     Abington. Is that right?
8  A  Correct.
9  Q  Okay. Do you know --
10        MS. GLINKA: Let me just mark that as
11    an exhibit.
12        (Whereupon the above-described
                   document was then marked as
13        Plaintiff's Exhibit No. 10)
14 Q  Do you know whether Waldron-Abington, LLC, had its
15    own safety plan or accident prevention plan for this
16    job?
17 A  I do not know.
18 Q  Okay. Would they have been required to do so under
19    the terms of the contract?
20 A  They would not -- I don't know. I really don't
21    remember. I suspect that they just used
22    Abington's --
23 Q  Okay.
24 A  -- plan; but I don't know for sure.
            Parisi Court Reporting  (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

Case 4:04-cv-40054-FDS    Document 26-3    Filed 10/17/2005    Page 9 of 9
DEPOSITION of THOMAS H. SHEPARD Taken 4/26/2005 (RICHARDS vs SOUTHBRIDGE)

SHEET 19  PAGE 73

73

1    MS. GLINKA: If you want to give me
2    a clean copy, we'll just change it.
3    MR. SACHS: All right. That's fine.
4    Sorry about that.
5    MS. GLINKA: That's all right.
6  Q  I take it you have no understanding as to the nature
7    of Mr. Richard's injury other than anything you may
8    have learned --
9  A  That's correct.
10  Q  -- in the course of this litigation.
11  A  That's correct.
12  Q  Do you know whether the pipes that were being
13    installed were -- they were using T braces to secure
14    those pipes?
15  A  I'm still -- I still am not sure which pipe he was
16    working on when it happened. And I'm not familiar
17    with that area. I'm not -- off of top of my head,
18    I'm not completely -- I don't remember exactly what
19    the supports were like.
20  Q  So it's possible some of them were secured with
21    T braces?
22  A  Possible. I don't know.
23  Q  Okay. Have you been back to the facility since
24    January of 2001?
          Parisi Court Reporting  (508) 984-5502

PAGE 74

74

1  A  Yes.
2  Q  Obviously, you were there for the monthly meetings.
3    But since the project was completed, have you been
4    back there on a regular basis?
5  A  Yes.
6  Q  And you still go back every once in a while?
7  A  Correct.
8  Q  How often do you go there now?
9  A  About once a month. Maybe a little less.
10  Q  And what is your precise role with respect to that
11    facility at this point?
12  A  I handle everything -- basically, I have complete
13    responsibility for the -- complete responsibilities
14    for the -- for the facility. On a day-to-day
15    operating basis, the Plant Manager's responsible for
16    it. He actually reports to the Plant Manager of the
17    plant that we have in Ohio now that was not involved
18    at all during the construction time. So they handle
19    the day-to-day actual operation.
20    But I deal -- I'm the sole interface
21    with the customer. So I deal -- I do -- I basically
22    perform the asset management role. So I do -- I'm
23    responsible for the billing, meeting with the
24    customer, contract issues with the customer,
          Parisi Court Reporting  (508) 984-5502

PAGE 75

75

1    anything along those lines, and ultimately
2    responsible for the operation of the facility, too.
3  Q  And does this trip here today correspond with a trip
4    you were planning to make to the facility anyway?
5  A  No.
6  Q  No. Sorry about that.
7  A  Yeah.
8  Q  And when would your next visit be scheduled for?
9  A  I don't have no schedules yet.
10  Q  Okay.
11  A  It's usually -- it just depends. There's not a --
12    it's not a regularly-scheduled meeting. But if I
13    have -- it's usually when I have things to talk to
14    the customer about that I do.
15  Q  Are you planning at this point to come back in May
16    for a visit?
17  A  I would -- it's very likely I'll be here in May;
18    but I have no trip planned.
19  Q  Okay. And if we wanted to arrange for a site visit,
20    we could do that?
21  A  Yes.
22  Q  Okay. Is it your understanding that to the extent
23    Mr. Richards may have sustained an injury at this
24    job site in January of 2001, that the responsibility
          Parisi Court Reporting  (508) 984-5502

PAGE 76

76

1    for any alleged defects or hazardous conditions
2    would fall under the Waldron-Abington, LLC, purview?
3  A  Yes.
4    MR. SACHS: Objection to the form.
5    Go ahead.
6  Q  And why is that?
7  A  They -- we -- we were contracting out to Waldron-
8    Abington basically full responsibility for this
9    project from construction -- engineering,
10    construction procurement, and safety standpoint.
11  Q  Have there been any lawsuits other than this one
12    associated with this project, the upgrade project?
13  A  No. There is none.
14    MR. SACHS: By that, you mean
15    contractual or anything?
16    MS. GLINKA: Aside from contractual.
17    MR. SACHS: Okay.
18  Q  Any other personal injury claims or work-injury-
19    related claims that you're aware of?
20  A  Not that I'm aware of.
21    MS. GLINKA: Well, this is either
22    good news or bad news, but I'm done. Thank you.
23    (All Exhibits Retained By Counsel)
24    (Time Noted at 11:54 a.m.)
          Parisi Court Reporting  (508) 984-5502

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * * *

GERALD F. RICHARDS                *    Civil Action No.

            -v-                   *    04-CV-40054-FDS

SOUTHBRIDGE POWER & THERMAL, LLC  *

* * * * * * * * * * * * * * * * *


DEPOSITION OF GERALD RICHARDS


Deposition taken at the Offices of Coughlin, Rainboth,
Murphy & Lown, 439 Middle Street, Portsmouth, New
Hampshire, on Friday, April 29, 2005, commencing at
10:00 a.m.




Court Reporter:


Elaine J. Ritsema, CCR, RPR


CCR No. 92 (RSA 331-B)

**Page 66**

1    Q.    Do you know why that is?
2    A.    Because of the thickness of the pipe and
3    what it's made out of. They call it a schedule 40
4    pipe.
5    Q.    Okay. So in terms of the particular job
6    site, did you receive any training from Abington
7    specifically related to this job site?
8    A.    We had safety meetings weekly, you know,
9    that would -- you know, lot of it was common sense,
10   you know, to use your head before doing anything or
11   check out the job or as far as any schooling or any
12   kind of explaining, you know, there was very little of
13   that.
14   Q.    Okay. And the safety meeting that you
15   were talking about occurred on a weekly basis?
16   A.    Yes.
17   Q.    Okay. And were those -- for lack of a
18   better term -- hosted by someone from Abington?
19   A.    Yes. Usually by the supervisor.
20   Q.    Okay. Who was the Abington supervisor
21   at the time?
22   A.    Tim -- I can't think of his last name.
23   I might have it maybe.
24   Q.    Okay.

**Page 67**

1    A.    Used to have an Abington card that had
2    all the supervisors' names. I'm not sure if I still
3    have it or not.
4          (Pause)
5          (Recess taken)
6    BY MR. SACHS:
7    Q.    Mr. Richards, you said you remember the
8    supervisor's name was who?
9    A.    Tim Davison.
10   Q.    Davison?
11   A.    Davison.
12   Q.    D-A-V-I-S-O-N?
13   A.    Yes.
14   Q.    Okay. All right.
15         And the meetings, the weekly meetings
16   that you were talking about, were they just -- and I
17   think you may have already testified to it -- but just
18   general safety issues, things like that?
19   A.    Basically. And if there was going to be
20   some specific job coming up, you'd want to go over it,
21   you know, kind of like step-by-step so nobody would
22   get messed up and do something out of the ordinary to
23   make it unsafe or something. But basically it was all
24   about safety.

**Page 68**

1    Q.    Okay. And what type of work were you
2    doing at the job site? I know it was welding, but in
3    terms of -- I mean, is it the type of work that you've
4    always done, or was it something different?
5    A.    Type of work that I've always done, but
6    every day was different. Some days I never even put
7    on a hood. I'd end up doing -- I'd fab up something
8    down to the fab shop or. . .
9    Q.    Okay. And where was the fabrication
10   shop?
11   A.    Was down by the trailers. Down by the
12   contractor's trailer. We had our own little tent set
13   up for a fab shop.
14   Q.    And where was the fab shop in comparison
15   to the building where you were doing work?
16   A.    In the back parking lot.
17   Q.    Okay. So within 50 yards of the
18   building?
19   A.    Within a couple -- yeah. Within
20   probably 400 feet, 500 feet.
21   Q.    Okay. And when you were working in the
22   fab shop, what were you doing down there mostly?
23   A.    Could be just moving stuff around with
24   the fork truck or bringing stuff in the yard into the

**Page 69**

1    fab shop to be worked on or to be opened up, like
2    boxes of pumps or whatever.
3    Q.    And in terms of the time that you were
4    there for however many months you were working there,
5    was your time split equally between welding duties and
6    the duties that you were just describing, or did you
7    do more welding than not?
8    A.    Probably split up 50/50 I'd say.
9    Q.    Okay. And can you briefly -- and we'll
10   get into it in detail, but I'm trying to get a bigger
11   picture of what was going on. At the time of the
12   accident, can you tell me just briefly, you don't have
13   to describe the accident at this point, but tell me
14   what you were doing at that time?
15   A.    When it happened?
16   Q.    Yes.
17   A.    Just beginning to weld.
18   Q.    Okay. And in terms of where you were
19   welding, where were you? You were in the building?
20   A.    Yes.
21   Q.    Okay. And where in the building were
22   you?
23   A.    Upstairs, up on a staging.
24   Q.    Okay. And you were welding pipes at the

**Page 70**

1   time?
2     A.  Yes. I was welding pipe, T's underneath
3 the pipe.
4     Q.  In terms of working up on the staging
5 that you're talking about, how long, that is number of
6 days, had you been working in that area at the time?
7     A.  Oh, I'd be in and out of that specific
8 area. Like one day I'd be in there, another day I'd
9 be out in the big room where the generators were, the
10 next day I'd be back in there or I could be in the
11 back alleyway working. It was -- it was thrown around
12 different jobs.
13     Q.  Okay. All right.
14     Can you describe to me -- insofar as the
15 building is concerned, can you describe to me what
16 that building was like in terms of, you know, the
17 rooms and where they were situated?
18     A.  Well, the specific room where I got
19 hurt, that is where the compressors were, I believe.
20     Q.  Okay.
21     A.  It was pretty tight quarters in there to
22 do that because you had two humongous compressors in
23 there; and to do any type of work in there, it was
24 clustered, you know.

**Page 71**

1     Q.  And so there was one room with the
2 compressors. Were there any other rooms in that
3 building?
4     A.  Yeah. There was a big room out front
5 with all the -- with all the generators that they were
6 putting in. There were supposed to be either four or
7 five new generators, diesel generators, put in.
8     Q.  And were those two rooms separated by a
9 wall?
10     A.  Yes.
11     Q.  Okay. Any other rooms that you recall
12 in that building?
13     A.  Yeah. If you went through the generator
14 and then went through this little doorway that led you
15 into the compressor room, walk through the compressor
16 room, if you took another right, there'd be another
17 doorway with -- that was just -- it's where a lot of
18 main pipes were run into, and there was -- it was like
19 a back entrance to some meter reading and things like
20 that.
21     Q.  Okay.
22     A.  That would go to the generators up
23 front. It was like an alleyway. There was gain boxes
24 set up in there, too. That must have been like from

**Page 72**

1 Southbridge Power. People that worked for Southbridge
2 Power themselves probably had their -- that's where
3 they set their boxes of tools up and stuff like that.
4     Q.  Okay.
5     A.  It's a secluded area.
6     Q.  In terms of the room where the
7 compressors were or are, where you said the accident
8 actually occurred, do you recall what else was in that
9 room in terms of materials, equipment?
10     A.  Yeah. There was a bunch of pipes on the floor,
11 there was a bunch of other little pumps set off --
12 depends which way you're looking at the compressors.
13 Bunch of little pumps and motors off to the left or
14 right which was -- had a bunch of valves hooked on it,
15 pipes that run up, up in the ceilings, too. There was
16 quite an area, probably about the size of this room,
17 that had just pumps and motors. I mean, little motors
18 and pumps and valves that were all on a little
19 concrete slab.
20     Q.  All right. And just for the record,
21 when you say the size of this room, it's 15 by 15,
22 somewhere around there?
23     A.  Yeah.
24     Q.  All right. In terms of where you were

**Page 73**

1 actually working on the pipes at the time of the
2 accident, were those pipes -- where were those pipes
3 coming from? That is did those pipes originate in
4 that room with the compressors, or did they come in
5 from somewhere else?
6     A.  They came in from the other room where
7 all the generators were.
8     Q.  All right. And how did those pipes pass
9 through the room where the generators were into the
10 room where the compressors were?
11     A.  They knocked out part of that concrete
12 wall.
13     Q.  Okay.
14     A.  Knocked a hole in the wall.
15     Q.  Were you there at the time they knocked
16 the hole in the wall?
17     A.  No. I wasn't.
18     Q.  Okay. And with regard to the pipes that
19 were coming in from the generator room, did you
20 install any of those pipes?
21     A.  No. I didn't.
22     Q.  Do you know who installed those pipes?
23     A.  Lot of times we would come back from the
24 morning and there'd be more pipes put in.

19 (Pages 70 to 73)

Page 74

```
1    Q.    Night shift was doing it?
2    A.    Night shift. Yeah. Abington didn't
3  have a lot of the -- lot of the work of putting up
4  pipes up in the air. Near the end of it we were
5  flying pipes up, but there was a lot of pipes going up
6  there that wasn't done from Abington.
7    Q.    Do you know who would have done that?
8    A.    I thought it was Southbridge Power.
9    Q.    Okay.
10   A.    But I'm not sure. There was another
11 company there, too; and I don't recall the name. At
12 this time I don't.
13   Q.    When you say you thought it was
14 Southbridge, who do you think Southbridge Power was,
15 though, that they were putting up pipe?
16   A.    Well, they were the owner of the place
17 anyways. They always had engineers around. Always
18 had engineers around, walking around, because they had
19 their own certain color hats so you could tell
20 Southbridge. Southbridge Power I think wore white
21 hats.
22   Q.    Like hard hats or --
23   A.    Yeah.
24   Q.    Did they have any insignia on them or
```

Page 75

```
1  anything?
2    A.    They would say Southbridge Power on
3  them, I believe.
4    Q.    And did you ever see any person with the
5  Southbridge Power hat flying pipe, as you said?
6    A.    I've seen 'em up in the air inspecting.
7  As far as flying, like I said, I know there was
8  other -- another company in there flying pipe.
9    Q.    Okay. And for the record when you say
10 flying pipe, you mean installing pipe?
11   A.    Bringing it up in the air. Yes.
12 Installing it. Getting it ready.
13   Q.    Okay. So it's your memory that Abington
14 didn't install all the pipe?
15   A.    No. They didn't.
16   Q.    Do you know what percentage of piping,
17 again in between the generator room and the compressor
18 room, the piping that goes from that room, from the
19 generator room to the compressor room, do you know
20 what percentage of piping Abington installed there?
21         MS. GLINKA: Objection. You can answer.
22   Q.    If you know.
23   A.    I don't know. At this time, I don't.
24   Q.    All right. Insofar as you said that you
```

Page 76

```
1  believe Abington was putting in pipe near the end, do
2  you recall what that time frame was?
3    A.    Well, like I said, putting in pipe. I
4  say they were just doing the hook-ups, basically.
5  Pipe was already been flown up in there.
6    Q.    Okay.
7    A.    But we were joining like the ends of the
8  pipe. Like I was welding on that end. After I got
9  done that, eventually would hook to another pipe that
10 was already coming to it that was hanging -- we'll say
11 could be two feet, could be ten feet away from the
12 pipe that I was working on. And then after
13 everything's secure, they do a measurement and they
14 fill that gap with another piece of pipe and weld both
15 sides.
16   Q.    Okay. So the pipe that you were working
17 on at the time of the incident, how was it suspended
18 up? I mean, I'm assuming it's up high. How was it
19 actually placed up there?
20         MS. GLINKA: Objection. You can answer
21 if you know how it was placed up there. You mean how
22 was it situated up there?
23         MR. SACHS: Yes.
24         MS. GLINKA: Okay.
```

Page 77

```
1          MR. SACHS: Sorry.
2          MS. GLINKA: Yes. Go ahead.
3    A.    It was situated up there on these
4  threaded rods that were mounted into the ceiling
5  coming down with a piece of channel iron. They call
6  it an H-beam that goes horizontal across, and then the
7  pipe comes down and sits onto a T-brace they call it.
8    Q.    Okay.
9    A.    And then that T-brace is sitting on that
10 frame, that H-beam.
11   Q.    Okay.
12   A.    And the pipe is welded to that T-brace.
13 But the pipe was just hanging in the air with a
14 come-along, chainfall.
15   Q.    Okay.
16   A.    Which there was pipes hanging all over
17 their chainfalls.
18   Q.    And do you know who had connected the
19 pipes to the chainfalls or the come-alongs?
20   A.    No. I don't.
21   Q.    All right. So was the pipe that was
22 suspended by the chainfalls, was it in the position
23 where you were to weld it, or did you have to move it
24 to certain positions?
```

20  (Pages 74 to 77)

**Page 78**

1   A.   No. It was in a position. It was
2   sitting on that T, and I had to weld that pipe to that
3   T.
4   Q.   Okay.
5   A.   The T was already up there tacked to the
6   H-beam. The H-beam was going this way (indicating).
7   You got a little T sitting here, they put a tack on
8   this side, a tack on this side of the T to hold the T
9   in place, then they put the pipe on the T. And my job
10  was to go up there and weld that pipe to the top of
11  the T on both sides and then finish welding the bottom
12  of the T onto the H-beam.
13  Q.   With regard to the pictures that we have
14  here, let's first look at this group. Looking at this
15  group to the left in front of you, do any of those
16  photos depict what you're talking about, the T or
17  anything?
18  A.   Yes. The T would be right here
19  (indicating). Here's the H-beam going across
20  (indicating).
21  Q.   Okay.
22  A.   Okay. And I did say there was threaded
23  rod holding this H-beam, but this has been finished
24  since. So they were going up with a regular I-beam

**Page 79**

1   and probably secured that right to the ceiling; but at
2   first there was just threaded rod. This was up there
3   temporary.
4   Q.   Okay.
5   A.   Okay. But the Ts are right here
6   underneath the pipe sitting on that H-beam. There's a
7   little T, piece of angle iron made like a T that sits
8   on top of this H-beam; and then the pipe sits down on
9   top of the T and you weld both sides of the pipe to
10  the top of the T and then both sides of that T to the
11  bottom to that H-beam. So the Ts are right underneath
12  each pipe.
13  Q.   Okay. And I'll mark the copies that I
14  have.
15  A.   These are the generator room, right
16  here.
17  MS. GLINKA: We'll get to that.
18  MR. SACHS: We'll get them.
19  Can we mark this as two.
20  (Exhibit 2 marked
21  for identification)
22  BY MR. SACHS:
23  Q.   All right. I'll show you this, what we
24  marked as Exhibit 2. I'm referring to the top photo.

**Page 80**

1   We're talking about the Ts underneath --
2   A.   They might --
3   MS. GLINKA: Wait a minute. Let him ask
4   his questions.
5   Q.   We were talking earlier about the Ts,
6   the T-braces, on top of that H-beam.
7   A.   Mm-hmm.
8   Q.   In terms of what's depicted in this
9   photo, the top photo of Exhibit 2, is this depicting
10  the compressor room that you talked about before?
11  A.   That is the compressor room. Yes, I
12  believe.
13  Q.   Okay. And in Exhibit 2 there's a hole
14  it seems in the wall where the pipe is passing
15  through?
16  A.   Mm-hmm.
17  Q.   Is that the hole that you were talking
18  about before?
19  A.   Yes.
20  Q.   Okay. And looking at Exhibit 2, do you
21  know if any of these pipes that are depicted are any
22  pipes that you welded in place?
23  A.   Yes.
24  Q.   Okay. And looking at Exhibit 2, which

**Page 81**

1   pipe or pipes do you think you welded in place?
2   A.   I think it was this one that come down
3   on me (indicating).
4   Q.   Okay. In the far right side of the
5   picture?
6   A.   I think so.
7   Q.   Okay. You think that's the actual pipe
8   that was involved in the accident?
9   A.   Yes.
10  Q.   Okay. In terms of the H-beam that you
11  described where the -- which is the gray piece --
12  A.   Right.
13  Q.   -- how were the pipes suspended -- I
14  know you said they were on chainfalls at the time, but
15  where were the chainfalls located in regard to the
16  H-beam?
17  A.   They were wrapped around the pipe here,
18  the chain, which is a no-no, too. It should have been
19  a strap on that and then the chainfall hooked to the
20  strap. But instead they were wrapping the chains
21  around the pipe rehooking to the chain with the end of
22  the snap, and that's not the way you do it.
23  But they were wrapped around that pipe,
24  and they were extended up onto the ceiling from an

21 (Pages 78 to 81)

Page 82

1    existing beam that was up there or whatever and jacked
2    off that.
3        Q.    All right.  So do you know who hooked
4    the pipe up to the chainfall in the first place?
5        A.    No.  I don't.
6        Q.    Okay.  So, as far as you know, you
7    showed up for work, the pipe was already up near the
8    H-beam on the chainfall?
9        A.    Yes.
10       Q.    Okay.  The day of the accident, was that
11   the first day that you had been welding any pipes up
12   in that area?
13       A.    Up in that area, yes.
14       Q.    Okay.  Other than the pipes up in that
15   area -- strike that.
16            Where else had you been welding in the
17   compressor room?
18       A.    Over here.  Maybe I can show it to you.
19   I don't know if there's another picture.
20           (Pause)
21       A.    Well, looking at these pipes, if this is
22   the compressor room, which I believe it is, down over
23   here on the left where all those little -- I'll tell
24   you those little pumps and valves were, I was doing

Page 83

1    some small pipes down here, like three inches and
2    stuff, little brackets and stuff like that.
3            Also, I wanted to point out is they may
4    consider that as a saddle, too, compared to a T-brace
5    like I was telling you.
6        Q.    Okay.
7        A.    Some people confirm that as a saddle
8    instead of a T-brace.  Some people use T-brace.  Could
9    be used as a saddle, too.
10       Q.    So the saddle, again, would it be
11   something that is welded onto the H-iron?
12       A.    The H-beam.
13       Q.    Okay.  I'll show you another photo.  See
14   if you can identify that one.
15       A.    I believe this is the pipe right here.
16       Q.    Okay.  Does that depict the same H-beam
17   as in Exhibit 2?
18       A.    Yes.
19       Q.    The same group of pipes?
20       A.    Yes.
21       Q.    Some pass through the wall?
22       A.    Yes.
23       MR. SACHS:  Can we just mark this as
24   three.

Page 84

1            (Exhibit 3 marked
2            for identification)
3    BY MR. SACHS:
4        Q.    All right.  In looking at Exhibit 3,
5    Mr. Richards, in looking at Exhibit 3, can you see or
6    identify in that photo where the chainfall was located
7    at the time of the incident?
8        A.    I think it was right in front of the
9    H-beam right here going up hooked to whatever's up
10   there to hook off from up on the ceiling.
11       Q.    Okay.  So you're pointing to in terms
12   of -- now, let's just for the record make it clear.
13   When we're talking about a chainfall, the chainfall is
14   it a pulley system?
15       A.    Yes.
16       Q.    Okay.  And was the top of the chainfall,
17   that is where the pulleys were housed, were they
18   attached to a beam that was higher than where the
19   pipes were in place?
20       A.    They were attached to a beam.  Either a
21   beam or there might have been a -- they might have had
22   to drill and mount something up there to hook it to.
23   I'm not really sure but there could have been an old
24   existing beam or they drilled and mounted a plate up

Page 85

1    there.
2        Q.    And with regard to the H-beam that
3    appears to be housing all those pipes, is that --
4    looking at it in the photo that's Exhibit 3, does that
5    look as it did on the day of the incident, or is it
6    different?
7        MS. GLINKA:  Objection.  Just the
8    H-beam?
9        MR. SACHS:  Yes.
10       MS. GLINKA:  Okay.  Objection.  You can
11   answer.
12       A.    See, some of the H-beams that they had
13   set up didn't have the H-beam going up to the ceiling
14   like this.  They had temporary with threaded rod.
15       Q.    Okay.
16       A.    I'm not sure what was up there that day.
17       Q.    Okay.  If you look at -- actually,
18   Exhibit 2, if you look at the base of the H-beam, does
19   it look like there's threaded bolts?
20       A.    Those are U-bolts.
21       Q.    Okay.  All right.
22       A.    That's a U-bolt going around a pipe that
23   sucks it down to the saddle.
24       Q.    Okay.

22  (Pages 82 to 85)

Page 102

1    your torso and your arm?
2        A.    I believe I was leaned right over that
3    vertical H-beam because there was, like I said, two
4    feet between that pipe and this one.
5        Q.    Okay.
6        A.    So I kind of laid over it with my arm
7    like this (indicating) and going like this
8    (indicating)
9        Q.    All right. So then would that threaded
10   rod have been behind you?
11       A.    Yes.
12       Q.    All right. Got it.
13       Okay. So your position, as you just
14   explained threaded rod is behind you, you have your
15   left arm on the horizontal H-beam. How close is your
16   left arm from the point where you were welding?
17       A.    From the point where I was welding,
18   probably eight inches.
19       Q.    Okay. And at that point where was the
20   pipe?
21       A.    Up on the T or the saddle.
22       Q.    So it was in place on the saddle?
23       A.    Mm-hmm.
24       Q.    All right.

Page 103

1        MS. GLINKA: T-brace?
2        THE WITNESS: Yes.
3    BY MR. SACHS:
4        Q.    T-brace, saddle, whatever?
5        A.    Yes.
6        Q.    So your arm was eight inches away from
7    the pipe that was sitting on the T-brace or saddle in
8    place?
9        A.    Like the T-brace was probably six inches
10   high.
11       Q.    Okay.
12       A.    So this would be the T-brace we'll say,
13   and my arm was like probably -- from that T-brace to
14   my arm it was probably four inches maybe. But from
15   the pipe being six inches up on that T-brace, it was
16   probably -- be probably eight inches like this
17   (indicating).
18       Q.    Okay. All right.
19       Was all of the weight of the pipe on the
20   T-brace at the time, or was it still suspended by the
21   chain?
22       A.    I didn't touch the chainfall. I got
23   told to go up there and weld. Don't touch nothing.
24   Everything's in place.

Page 104

1        Q.    Okay. How did the pipe move?
2        A.    Wish I knew. I think somebody stepped
3    on the other side -- on the other side of the wall.
4    They were throwing pipes up. Either that or they were
5    up there putting instrumentation up or putting small
6    electrical wires into that -- running new electrical
7    down into the new generators. I don't know.
8        But, as soon as I put my hood down and
9    started welding, I wasn't five seconds and I felt the
10   pressure on my arm; and I was able to yank it out.
11       Q.    So the pipe had to fall about six inches
12   to hit your arm?
13       A.    Yeah. Came down off the T. Yeah.
14       Q.    And did you -- at the time within the
15   minutes before you were welding, did you hear anybody
16   on the other side of the pipes?
17       A.    It was so hard to hear in there with
18   machinery and stuff, was incredible. You know,
19   because we had -- those compressors were running.
20       Q.    Okay. And do you know how the pipes
21   were attached on the other side of the wall through
22   the void?
23       A.    Hanging on chainfalls.
24       Q.    Okay. And, as you were positioned

Page 105

1    during the welding, to your right where did the pipe
2    go from there? Did it just end, hanging in the air?
3        A.    Where it was position to the right, it
4    was going through the wall.
5        MS. GLINKA: Objection. I think he
6    means after it fell off the T-brace.
7        Q.    No. In terms of --
8        A.    If I was looking at the pipe, like
9    there --
10       MS. GLINKA: Hold on. Wait for a
11   question.
12       A.    Welding it would be going through the
13   wall.
14       Q.    All right. In terms of the side that
15   wasn't going through the wall --
16       A.    Okay.
17       Q.    -- did it just -- was it like five feet
18   away was the end of the pipe or what was there?
19       A.    Six, eight feet away that was the end of
20   the pipe coming out this way (indicating).
21       Q.    Okay. And where was the chainfall on
22   the pipe positioned?
23       A.    Right in back of me. Right towards the
24   wall.

27  (Pages 102 to 105)

Page 106

1    Q.    Towards the hole in the wall?
2    A.    Yes.
3    Q.    Okay. And how much slack was in the
4    chainfall at the time?
5    A.    Wasn't none.
6    Q.    What's that?
7    A.    None.
8    Q.    None?
9    A.    None. Not that I could see anyways. I
10   mean, it was snug. The chain was snug because it
11   wasn't flopping. You could tell if it was flopping.
12   If it would have been flopping, I would have jacked it
13   myself.
14   Q.    What do you mean?
15   A.    I would have brought it up myself to get
16   the slack out of it, but the chainfall was already
17   snug because they told me everything was all set.
18   Just go up there and weld. You're all set. So I
19   didn't touch nothing because I figured they had it to
20   specs and they wanted it right there.
21   Q.    When you say they, who is they? Who
22   said go up there and weld that pipe?
23   A.    Not sure if it was Tim Davison, or it
24   could have been one of the foremen.

Page 107

1    Q.    Someone from Abington?
2    A.    Yes.
3    Q.    Do you know if it was someone from
4    Abington who had set the pipe in the position where
5    they wanted it welded?
6    MS. GLINKA: Objection.
7    A.    I don't believe it.
8    Q.    You don't believe it was?
9    A.    No.
10   Q.    Do you know who it was?
11   A.    I don't. Like I said, lot of them pipes
12   we didn't put in there. I know we didn't. Because I
13   knew what we did, and I knew what the crew did; and I
14   know that we started doing the hookups on the end of
15   the pipes. That was mainly when we started taking
16   over a lot of the pipe work.
17   Q.    So if the chainfall was snug, how did
18   the pipe move?
19   A.    Because -- it was snug but it was -- it
20   was on the T. Just hitting the T or the saddle.
21   Okay? And, I mean, it's snug. I mean, put it this
22   way, when you're looking at it, it ain't all floppy.
23   Okay? But that pipe weighs 2,000 pounds. So whatever
24   happened at the other end to make that pipe roll, it

Page 108

1    rolled off that T, and so it went like this
2    (indicating). You know, what I'm saying?
3    Even if this chainfall was snug, you got
4    2,000 pounds. Might have been a little play in that
5    chainfall. There was enough for it to come down, hit
6    my arm.
7    Q.    How do you know the pipe was 2,000
8    pounds?
9    A.    Because 18-inch pipe 20 feet long is
10   2,064 pounds or something.
11   Q.    But didn't you say before that the other
12   end of the pipe in the generator room was also on a
13   chainfall?
14   A.    Yes.
15   Q.    Okay. So wouldn't that have prevented
16   it from doing a seesaw motion?
17   MS. GLINKA: Objection.
18   A.    Not if somebody walked on it.
19   Q.    Okay. But you don't know if someone
20   walked on it, though, right?
21   MS. GLINKA: Objection. You can answer.
22   A.    I got told there was other people up
23   there; but, as soon as this accident happened,
24   everybody scattered.

Page 109

1    Q.    When you say you were told that other
2    people were up there, was that before or after the
3    accident?
4    A.    After the accident.
5    Q.    Okay. Who told you that there were
6    other people up there?
7    A.    Two or three different people.
8    Q.    Okay. Who, though?
9    A.    I don't recall the names. I remember
10   one guy saying, yeah, there was a couple up there.
11   That's all I can tell you. I was in so much pain, I
12   just got out of there.
13   Q.    What time of the day was the accident?
14   A.    Early afternoon. Right after lunch.
15   Like two o'clock, I think.
16   Q.    What'd you have for lunch that day?
17   A.    Something off the gut truck.
18   Q.    The gut truck?
19   A.    Yeah.
20   Q.    Was that one that pulls up to job site?
21   A.    Yeah.
22   Q.    I'm going to give you some documents,
23   and this one -- we can go off for a second.
24   (Discussion off the record)

Page 134

1      MS. GLINKA: Kary, K-A-R-Y.
2      MR. SACHS: Oh, no. Actually --
3      MS. GLINKA: Talking about a different
4  doctor?
5      MR. SACHS: I'm talking about
6  Dr. C-O-U-R-Y. Dr. Timothy Coury.
7      MS. GLINKA: Can we see the record that
8  you're referring to?
9      A.    That's not spelled right. Coury. Not
10  Coury. Kary.
11      MS. GLINKA: Well, this is a different
12  doctor, I think.
13      A.    Lewiston, Maine, Kary.
14      MS. GLINKA: Doesn't matter how it's
15  spelled.
16  BY MR. SACHS:
17      Q.    With regard to this record that your
18  counsel just showed you, do you remember going to the
19  hospital whatever Dr. Kary it was, however you spell
20  it, with back pain in August of 2001?
21      A.    I believe so.
22      Q.    Do you remember what happened, like how
23  the back pain came on?
24      A.    Not sure.

Page 135

1      Q.    Okay. Do you remember going to the
2  doctor in -- do you remember going to the doctor
3  for -- I'm not sure what doctor it was but for some
4  sort of knee problem?
5      A.    Yes.
6      Q.    Do you remember what that was all about?
7      A.    Yes. I ended up with cellulitis.
8      Q.    Okay. And do you remember when you
9  first -- well, strike that.
10      Do you remember about when that was,
11  time frame was? If I suggested it was October of
12  2002, does that refresh your memory at all?
13      A.    Possibility, yes.
14      Q.    Okay. And do you recall what you were
15  doing at the time that you first noticed pain in your
16  knee?
17      A.    No.
18      Q.    Okay. I'll show you this record, ask
19  you if you've seen that before?
20      MS. GLINKA: If he's seen it before?
21      MR. SACHS: Yes.
22      (Pause)
23      A.    I recall it now.
24      Q.    Okay.

Page 136

1      MS. GLINKA: Have you seen this record,
2  though?
3      THE WITNESS: No.
4  BY MR. SACHS:
5      Q.    All right. But insofar as looking at
6  the medical record, does it refresh your memory as to
7  what the triggering event was for the knee pain?
8      A.    (Nods).
9      Q.    And what was it?
10      MS. GLINKA: Yes.
11      A.    Washing the floors.
12      Q.    Okay. And the record says you were down
13  on your hands and knees washing the floors?
14      A.    Mm-hmm.
15      MS. GLINKA: The old-fashioned way.
16      A.    If you seen my floors, you'd know why.
17      Q.    Were these the floors that you had
18  recently put the new tile down on?
19      A.    Yes.
20      Q.    Okay. In terms of your left arm injury,
21  do you recall when you first had surgery for that?
22      A.    No. I don't.
23      Q.    Okay. Would you agree with me that it
24  was before October of 2002?

Page 137

1      A.    Yes.
2      Q.    Okay. All right.
3      And as a result of this knee injury, you
4  had to use crutches, right?
5      A.    Yes.
6      Q.    Okay. And how long did you use
7  crutches?
8      A.    Maybe about four or five days. I was
9  kind of like in bed for quite a while with the knee.
10      Q.    In bed for what?
11      A.    Quite a while with the knee.
12      Q.    Do you recall what doctor you saw with
13  regard to your arm that eventually recommended the
14  surgery?
15      A.    No. I don't. Not really. I went and
16  seen so many.
17      Q.    All right. Well, regardless of your
18  memory of what doctor it was, do you have any memory
19  of discussions with whatever doctors about the need
20  for surgery for your arm?
21      A.    I remember talking to Dr. Timoney about
22  it.
23      Q.    Okay. And do you remember what that
24  discussion was? That is what did the doctor tell you

35  (Pages 134 to 137)

**Page 138**

1    about why you needed surgery and things like that?
2        A.    Well, not -- well, kind of. He
3    explained to me what it would do is it makes the nerve
4    a straighter shot by moving the nerve from the back
5    side, putting it over here. Gives it a straighter
6    shot. Gives it more of a chance to try to come back.
7    That was. . .
8        Q.    Okay. And in terms of the nerve that
9    you're talking about, do you remember what the doctor
10   said was wrong with you in terms of the injury from
11   the incident?
12       A.    Crushed.
13       Q.    Okay.
14       A.    Nerve was crushed.
15       Q.    The nerve was crushed?
16       A.    Yes.
17       Q.    Okay. And do you recall any discussions
18   with any doctors about carpal tunnel syndrome?
19       A.    Yes.
20       Q.    And do you recall when you first were
21   diagnosed with carpal tunnel syndrome?
22            MS. GLINKA: Objection. You can answer.
23       A.    Not really.
24       Q.    Okay. But do you recall whether the

**Page 139**

1    carpal tunnel syndrome was in both arms? Do you
2    recall that?
3        A.    Yes.
4        Q.    Okay. And do you know when you first
5    started feeling symptoms of carpal tunnel syndrome?
6        A.    This arm would go to sleep like almost
7    every night.
8        Q.    Your left arm?
9        A.    Yeah.
10       Q.    Okay.
11       A.    And I think that's what they -- I think
12   that's what Dr. Timoney determined. He said maybe
13   that carpal tunnel has kicked up more in this arm
14   since it got hurt.
15       Q.    Okay.
16       A.    On the right arm.
17       Q.    Do you recall, though, previous to the
18   accident whether you had already been diagnosed with
19   carpal tunnel syndrome?
20       A.    I never really had any problems. I
21   mean, I never could feel any problems really, you
22   know, basically, to be honest with ya.
23       Q.    But in terms of doctor visits and
24   whatnot, do you recall ever seeking treatment for

**Page 140**

1    carpal tunnel syndrome --
2        A.    No.
3        Q.    -- prior to the accident?
4        A.    No.
5        Q.    And with regard to your eventual
6    surgery, how many surgeries did you have?
7        A.    Three.
8        Q.    Okay. And do you know whether all of
9    those surgeries were related to this crush injury?
10       A.    Yes.
11       Q.    Okay. Did you have any other surgeries
12   for carpal tunnel syndrome or something?
13       A.    No. I had carpal tunnel in this left
14   arm surgery.
15       Q.    I'm sorry. Say that again.
16       A.    I had surgery in this left arm for
17   carpal tunnel. That was my third surgery.
18       Q.    Okay. But you believe that was related
19   to the --
20       A.    Accident.
21       Q.    -- the accident?
22       A.    It was progressed or whatever you call
23   it.
24       Q.    Okay. In terms of surgeries, do you

**Page 141**

1    recall sitting here today when that first surgery was?
2        A.    Ulnar nerve transplant or something.
3        Q.    No. The time frame when the first
4    surgery was.
5        A.    When?
6             MS. GLINKA: I think he said he doesn't
7    remember.
8        A.    I don't remember that.
9        Q.    All right. Bear with me. If I was to
10   suggest to you that the first surgery was in June of
11   2001, would that spark your memory at all?
12       A.    Yes.
13       Q.    Okay.
14       A.    I believe so.
15       Q.    All right. And after the first surgery,
16   do you recall what your discharge instructions were,
17   that is what you were told to do upon leaving the
18   hospital?
19       A.    Therapy three days a week.
20       Q.    And who -- was that therapy that you
21   would travel for, go to the hospital?
22       A.    Yes.
23       Q.    Where was that therapy?
24       A.    That was in -- actually, a new place in

36 (Pages 138 to 141)

Page 154

1   job or of the plant or. . .
2       Q.    Okay. But in your answer it says it's
3   your understanding that they were the general
4   contractor, which is different than the owner; is that
5   true?
6       A.    Well, yes, it is; but I remember seeing
7   a bunch of Southbridge Power names on the hats which,
8   you know, they were -- must have been engineers or
9   whatever. So I figured they were the big cheese of
10  the outfit.
11      Q.    Okay. And in terms of Southbridge, what
12  should have or could have Southbridge done that would
13  have avoided this accident?
14          MS. GLINKA: Objection. You can answer.
15      A.    Finished hooking up a few pipes before
16  they ran up ten more. You know, if there were three
17  or four up there hanging, they should continue, finish
18  them pipes, get the chainfalls down and then rig up
19  more and go from there.
20      Q.    What's the basis for saying that
21  Southbridge put the pipes up there on the chainfalls?
22      A.    I don't know.
23      Q.    Okay. So if --
24      A.    But if they were the engineers, they're

Page 155

1   supposed to be -- you know, engineers are supposed to
2   be -- you know, I would think Southbridge has their
3   own safety man, too. Should have went through and
4   seen that and put a stop to it.
5       Q.    Well --
6       A.    In my book.
7       Q.    Well, when you went up there on the
8   staging before you did any work, I mean, did you go
9   and say, hey, I'm not going up there? Did you ever do
10  that?
11          MS. GLINKA: Objection.
12      A.    No. I didn't.
13      Q.    All right. Well, did you think it was
14  unsafe going up there?
15          MS. GLINKA: Objection.
16      A.    I didn't like it but I didn't really
17  think it was unsafe. No.
18      Q.    Okay.
19      A.    I didn't think there'd be other people
20  on the other side walking on my pipes. Which that had
21  to be what happened because the pipe didn't move on
22  its own.
23      Q.    Okay. So then what's your basis for
24  saying that someone else should have thought it would

Page 156

1   be safe?
2           MS. GLINKA: Objection.
3       A.    I just think they just -- in my own
4   opinion it should have been so many pipes put up and
5   finished and then some more put up to make it a safer
6   job.
7       Q.    All right. And, again, you don't know
8   who actually put the pipes up there?
9           MS. GLINKA: Objection. Asked and
10  answered. We're not going to go repeating questions
11  we've asked before.
12      Q.    In terms of your retraining that you
13  finished in August of 2004, do you recall working with
14  some people affiliated with the insurance company that
15  were going to help you get a job?
16      A.    Yes.
17      Q.    Okay. And do you recall the process
18  that you went through with those people? Did you go
19  in for an interview or something?
20      A.    I met with -- I'd meet with -- I can't
21  remember his name now. He was a pretty nice guy,
22  actually.
23      Q.    I think there were a couple different
24  people.

Page 157

1       A.    Yes. There was. There was a guy and a
2   woman, and they both got terminated.
3       Q.    There's one -- Rick McElvine?
4       A.    McElvine. He was a nice guy.
5       Q.    And the other person, Kathleen Wong,
6   does that ring a bell?
7       A.    Yes.
8       Q.    Okay. And in terms of those two, was
9   Rick McElvine the first person you worked with?
10      A.    Yes.
11      Q.    And did you go in for a face-to-face
12  meeting with Mr. McElvine?
13      A.    Yes. I did.
14      Q.    Okay. Was that before you actually went
15  to Florida for the training?
16      A.    Yes.
17      Q.    Okay. And did you sit down with him and
18  come up with some sort of plan or something?
19      A.    Yes. He asked me what I wanted to do.
20  I said the only way I can stay in construction is --
21  basically, you know, it's been my whole livelihood. I
22  said I want to stay in construction. I said I ran
23  crane on and off, jumping in them before for
24  companies, not being an operator, just jumping in them

40  (Pages 154 to 157)